(666 P.2d 207)
No. 54,139

STATE OF KANSAS, *Appellee,* v. DOUG HEISKELL, *Appellant.*

Opinion filed June 30, 1983.

*Timothy A. Short* and *Fred Spigarelli,* of Pittsburg, for the appellant.

*Charles S. Gray,* county attorney, and *Robert T. Stephan,* attorney general, for the appellee.

Before FOTH, C.J., ABBOTT and MEYER, JJ.

FOTH, C.J.: This is an appeal by defendant Doug Heiskell from a jury conviction of disorderly conduct (K.S.A. 21-4101), obstructing legal process (K.S.A. 21-3808), and battery against a law enforcement officer (K.S.A. 21-3413). On appeal he primarily challenges the instruction given defining disorderly conduct and the failure to give a self-defense instruction on the other two counts.

All three charges arose out of a single incident. At approximately 1:00 a.m. on May 23, 1981, defendant and three friends stopped at a Quik-Trip store in Parsons for gasoline and cigarettes. As they departed in a car driven by Leroy Murdock, someone threw a bottle or rock at the car. Murdock sped around the corner, attracting the attention of Parsons police officer Bob Mohney who stopped the car. Murdock got out of his car to explain what had happened. As to what transpired thereafter the jury was presented with the law enforcement version and the defendant's version.

Officer Mohney testified that as he was talking to Murdock, defendant got out of the car and barraged him with verbal abuse and threats. Officer John Keele, who arrived approximately one minute later, stated that defendant called Officer Mohney "a clubhappy motherfucking son-of-a-bitch" and told him he was going to "kick his ass." Defendant's comments, apparently the result of a prior incident involving his brother, were also directed toward Officer Keele. Officer Keele arrested defendant for disorderly conduct.

Defendant refused Officer Keele's orders to put his hands on a car, stating that he would not go with "clubhappy motherfuckers" but would instead go with Officer Denny Dietsche, an old acquaintance who had just arrived at the scene. Officer Mohney testified that, as Officer Dietsche led defendant away, defendant turned and started towards him with his fists drawn. While Officer Kenneth Steenrod likewise said defendant's fists were drawn, Officers Keele and Dietsche said he merely pointed a finger at and verbally threatened Officer Mohney. Keele and

Dietsche did not see defendant move towards Mohney. Officer Keele testified that he grabbed defendant's arm and attempted to place him against a car, but defendant broke free and grabbed Keele around the neck and hair. All of the officers concurred that defendant placed a headlock on Officer Keele. The charges of obstructing legal process and battery of a law enforcement officer were based upon this incident.

With the assistance of several other officers defendant was subdued, handcuffed, and placed in Officer Keele's patrol car. Officer Keele took defendant to the police station by himself with defendant riding in the front seat of the patrol car.

Defendant Doug Heiskell and other defense witnesses painted a markedly different picture of the incident. He claimed to have been the victim of police brutality. Defendant testified that as soon as he got out of the car Officer Mohney told him he was under arrest but would not explain why. Officer Keele acted in the same manner after his arrival. After Officer Dietsche explained that the arrest was based on an outstanding warrant issued for defendant's prior use of profanity in public, defendant walked towards Officers Mohney and Keele with his hands in the air, stating, "You can arrest me." At that point, Officer Keele grabbed the back of defendant's neck and shoved his head into a car windshield. He alleged that Officer Mohney and other officers gouged him with their flashlights; he claimed to have been hit four to six times. The flashlights each contained 5 "C" cell batteries and doubled as nightsticks. Defendant claimed that he offered no resistance: ". . . I was just like a limp doll, I let them shove me and do whatever they wanted to do. I didn't resist them at all." He denied using any profanity until after the officers began "clubbing" him. He also denied applying a headlock to Officer Keele. He claimed that he was taken to the police station by Officers Keele and Mohney, and while en route was struck twice again by Officer Mohney after admittedly calling him a "clubhappy son-of-a-bitch."

At the police station his requests for medical attention and for someone to photograph his injuries went unheeded. After posting bail the following day, he went to the hospital where he was treated for knots on his head, bruised ribs, lacerations to his back and an injured thumb. Hospital records substantiating his injuries were admitted into evidence. Defendant's story was cor-

roborated by defense witnesses Leroy Murdock and Hugh Lamb, defendant's companions, and William Carey, a customer at the Quik-Trip. His allegations were denied in all respects by the police officers.

Following the denial of defendant's motion for a new trial, he was sentenced to concurrent terms of 30 days for disorderly conduct and six months each for obstructing legal process and battery against a law enforcement officer. He thereafter perfected the present appeal.

### Disorderly Conduct

In considering defendant's argument on this point it must be borne in mind that the disorderly conduct charge was based *solely* on defendant's use of abusive and threatening language. The statute also proscribes such activities as brawling, disturbing a meeting, or noisy conduct, but we deal here only with speech. Jury instruction 8 was the jury's definition of disorderly conduct:

"The defendant is charged in Count I with the crime of disorderly conduct. The defendent pleads not guilty.

"To establish this charge each of the following claims must be proved:

"1. That the defendant used offensive, obscene, or abusive language.

"2. That the defendant acted with knowledge or reasonable cause to believe that his acts would alarm, anger, or disturb others or provoke an assault or other breach of the peace.

"3. That this act occurred on or about the 23rd day of May, 1981, in Labette County, Kansas."

This instruction incorporates the language of the statute and was based on PIK Crim. 2d 63.01. Defendant's timely objection to this instruction was overruled. Defendant alleges that the instruction was overly broad and permitted the jury to convict him for the use of constitutionally protected speech.

The constitutionality of K.S.A. 21-4101 was before our Supreme Court in *State v. Huffman*, 228 Kan. 186, 612 P.2d 630 (1980). After a detailed analysis of the First Amendment issues involved the court found the statute facially overbroad, but judicially rehabilitated it by stating:

"K.S.A. 21-4101 can withstand constitutional challenge for overbreadth when authoritatively construed to prohibit speech within the limited category of fighting words. Fighting words are those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." 228 Kan. 186, Syl. ¶ 4.

See *Lewis v. City of New Orleans,* 415 U.S. 130, 39 L.Ed. 2d 214, 94 S.Ct. 970 (1974); *Gooding v. Wilson,* 405 U.S. 518, 31 L.Ed. 2d 408, 92 S.Ct. 1103 (1972). See generally *Chaplinsky v. New Hampshire,* 315 U.S. 568, 86 L.Ed. 1031, 62 S.Ct. 766 (1942). The court there upheld a state statute which, as authoritatively construed by the state court, prohibited only words "plainly likely to cause a breach of the peace by the addressee." 315 U.S. at 573.

In charging a jury in a criminal case, it is the duty of the trial court to define the offense charged, stating to the jury the essential elements of the crime, either in the language of the statute or in appropriate and accurate words of its own. *State v. Miller,* 222 Kan. 405, Syl. ¶ 7, 565 P.2d 228 (1977); *State v. Loveland,* 8 Kan. App. 2d 196, 202, 653 P.2d 472 (1982), *rev. denied* 232 Kan. 876 (1983). As the statute was construed in *Huffman,* an essential element of disorderly conduct based purely upon a defendant's speech is that the speech constitute "fighting words." The instruction given made no mention of that element of the offense. The instruction was in the disjunctive and would have allowed defendant to be convicted if the jury found that his language was simply offensive and angered others.

PIK Crim. 2d 63.01 is a carbon copy of its pre-*Huffman* predecessor. It adquately defines disorderly conduct where the offense consists of acts and not mere words. Where words are the gravamen of the offense, however, the jury must find that the words spoken were fighting words, *i.e.,* that they were of such a character that their very utterance caused injury or that they tended to incite the listener to an immediate breach of the peace. Since the jury was not so instructed here, and defendant could thus have been convicted for the use of constitutionally-protected speech, his conviction for disorderly conduct must be reversed.

### Self-Defense

Defendant's request for a self-defense instruction was denied by the trial court on the ground that "defendant's theory does not include self-defense and is inconsistent with the facts." The court did instruct the jury that a person is not authorized to use force to resist even an unlawful arrest and that a law enforcement officer is justified in the use of any force which he believes to be necessary to defend himself from bodily harm while making an

arrest. These instructions were based upon K.S.A. 21-3217 and 21-3215, respectively. Defendant alleges the court erred in refusing to give a self-defense instruction, particularly in light of the other instructions which were given.

K.S.A. 21-3217, which precludes the use of force in resisting even an unlawful arrest, is based upon Ill. Ann. Stat. ch. 38, § 7-7 (Smith-Hurd 1972). In the 1961 Committee Comments to the Illinois statutes the drafters state that the section "does not apply to the situation in which the officer uses excessive force: whether the arrest is lawful or unlawful, the officer's use of excessive force invokes the right of self-defense . . . ." The two prior Illinois cases cited in support of this principle are *People v. Doody,* 343 Ill. 194, 175 N.E. 436 (1931), and *People v. Smith,* 315 Ill. App. 671, 43 N.E.2d 420 (1942). In *Doody,* the defendant was convicted of murder in the shooting death of a police officer. After being told to get out of a stolen car by the officer, the defendant ran. When the officer fired his gun, the defendant returned fire, killing the officer. The conviction was reversed for failure to fully instruct the jury on the law of self-defense. 343 Ill. at 215-16. In *Smith* it was held that a defendant could use only that force which was necessary to repel an assault by an officer made during the course of an arrest.

The right to self-defense in the face of excessive force by a police officer appears to be a universally recognized rule. A reason often cited for the rule is that a person who is illegally arrested can turn to the courts for recourse, but one who suffers loss of life or limb as a result of excessive force has no such recourse. For a detailed discussion of this subject, see Annot., Right to Resist Excessive Force Used in Accomplishing Lawful Arrest, 77 A.L.R.3d 281. See also Meyer, *Arrest Under the New Kansas Criminal Code,* 20 Kan. L. Rev. 685, 719-20 (1972); Model Penal Code § 3.04, Comment 2 (Tentative Draft No. 8, 1958); 5 Am. Jur. 2d, Arrest § 94; 6A C.J.S., Assault & Battery § 92. In *Commonwealth v. Moreira,* _____ Mass. _____, 447 N.E.2d 1224 (1983), an assault and battery case, the Supreme Judicial Court of Massachusetts presents an in-depth discussion of the distinction between resisting arrest and employing self-defense in the face of excessive force. The court held that in the latter situation an arrestee "may defend himself by employing such force as reasonably appears to be necessary." 447 N.E.2d at 1228.

Neither the State nor the trial court has taken the position that an arrestee is not entitled to a self-defense instruction in a proper case. The State explicitly conceded at the argument on the motion for new trial and inferentially in its brief on appeal that if there had been evidence of defense against excessive use of force by the police such an instruction would have been appropriate. The trial court's denial, as noted, was based on its finding that "the defendant's theory does not include self-defense and is inconsistent with the facts," and not on the theory that an arrestee must submit to the use of excessive force by the police.

A defendant is entitled to an instruction on his theory of the case even though the evidence introduced thereon is slight and supported only by defendant's own testimony. *State v. Sullivan & Sullivan,* 224 Kan. 110, Syl. ¶ 10, 578 P.2d 1108 (1978). See also *State v. Hargis,* 5 Kan. App. 2d 608, 609, 620 P.2d 1181 (1980), *rev. denied* 229 Kan. 671 (1981) ("any evidence whatsoever"). It is the function of the appellate court to determine whether the record discloses any evidence which, considered in the light most favorable to defendant, would have justified giving the requested instruction. *State v. Hargis,* 5 Kan. App. 2d at 609. See also *State v. Kleber,* 2 Kan. App. 2d 115, 116-17, 575 P.2d 900, *rev. denied* 225 Kan. 846 (1978).

There can be no doubt that throughout his testimony defendant denied any battery upon any of the officers. He insisted he was a "limp doll" throughout the altercation, including the alleged beating by the officers. The closest he came to admitting a battery was when he qualified his denial of touching Officer Keele: "If I did, it might have been when I was goin' on the hood and they were shoving me." On the other hand, the officers all testified to a struggle in which defendant had a headlock on Officer Keele. To convict, the jury had to believe the officers' testimony about the headlock and disbelieve defendant's limp doll story. They were not, however, called upon to determine whether excessive force was used or whether that force justified defendant's application of a headlock. Although the State suggests that affirmative answers were unlikely, they were not impossible if the jury chose to accept some part and reject the balance of each of the two versions. The jurors were not given that choice because they were not instructed to make that determination.

In making its determination not to instruct on self-defense the trial court obviously accepted defendant's denials as representing the entirety of his theory of the case. The question finally comes down to whether a defendant who denies commission of an offense is nonetheless entitled to a self-defense instruction. We find two Kansas cases dealing with the subject. The first is *State v. Jackett,* 81 Kan. 168, 105 Pac. 689 (1909). Jackett was convicted of manslaughter in the shooting death of a member of a group of youths who were throwing rocks at his house. Though he admitted firing the fatal shot at the time of his arrest, he denied having done so at trial. The trial court rejected Jackett's request for a self-defense instruction since Jackett had denied shooting anyone. In holding he was entitled to such an instruction, our Supreme Court stated:

"In a prosecution for a homicide, where there is substantial evidence tending to show that the accused acted in self-defense, the fact that he denies having committed the act which caused the death is not necessarily a ground for refusing to submit to the jury the question whether the killing was justifiable." Syl.

The court noted that the jury could have disbelieved Jackett's denial that he did not commit the homicide but nonetheless found his actions to have constituted justifiable self-defense. 81. Kan. at 171.

The second case is *State v. Smith,* 161 Kan. 230, 167 P.2d 594 (1946). That was also a homicide case. Defendant insisted at trial that she did not stab the deceased, but the State's evidence was that she did. There was also evidence of a quarrel. Neither side requested a self-defense instruction but the court held:

"When in the trial of a prosecution for murder the evidence presents an issue of self-defense it is the duty of the trial court, under our statute G.S. 1935, 62-1447, to submit to the jury under proper instructions the question of whether the killing was justifiable notwithstanding the fact the accused denies having committed the act which resulted in death and irrespective of whether there is a request for such instructions." Syl. ¶ 1.

To our knowledge *Jackett* and *Smith* still represent the law in this state. They are in line with what appears to be the general rule, at least in homicide cases, that a defendant who denies committing a homicide is nonetheless entitled to a self-defense instruction if that issue is raised by any evidence. See 40 Am. Jur. 2d, Homicide § 521; 41 C.J.S., Homicide § 375. See, *e.g., State v.*

*Taylor*, 261 S.C. 437, 200 S.E.2d 387 (1973). We find no authority which leads us to believe the doctrine is or should be limited to those cases where the self-defense results in the death of the aggressor.

Further, there is no requirement a defendant must rely upon his own testimony to merit a self-defense instruction. That is the clear lesson of *Jackett* and *Smith*. See also 1 Wharton's Criminal Evidence § 27 (13th ed. 1972). A defendant is entitled to a self-defense instruction if there is any evidence from which a jury could conclude that, despite his denial, a defendant committed an act but did so in self-defense.

In this case had the jury chosen to credit defendant's testimony about the use of excessive force plus the officers' testimony about the headlock they could have found justification for both the battery and the resistance which amounted to obstructing legal process. Accordingly, it was error to refuse to instruct on self-defense, and the error goes to both charges based on the alleged headlock.

## Other Claims

During his cross-examination of the police officers, defense counsel pointed to certain inconsistencies between the officers' testimony and the contents of their official reports. For example, Officer Mohney testified on direct examination that, as Officer Dietsche led defendant away, defendant broke free and started toward him with his fists drawn, while in his report he merely stated that defendant looked at Officer Keele and threatened to "kick his ass," prompting Officer Keele to "[push] Heiskell up against the car." Officer Keele's report likewise made no reference to the alleged assault to which Officer Mohney had testified. Officer Dietsche's report indicated that defendant was pulled from his grasp rather than breaking away as the other officers testified. Defendant's motion to introduce the reports into evidence was overruled, the court finding that admitting the reports would be prejudicial to the State because the jury might attach more weight to written documents than to oral testimony, and noting that defendant had been able to use the reports to cross-examine the witnesses. Each witness had been asked about the discrepancies and none had been able to give any explanation.

The trial court's ruling was based in part upon K.S.A. 60-422(*b*) which provides:

"As affecting the credibility of a witness . . . (*b*) extrinsic evidence of prior contradictory statements, whether oral or written, made by the witness, may in the discretion of the judge be excluded unless the witness was so examined while testifying as to give him or her an opportunity to identify, explain or deny the statement . . . ."

Gard's Kansas C. Civ. Proc. 2d Annot. § 60-422 (1979) states that if a witness "has admitted making the statement or some statement which is contradictory to his testimony, that ends the matter and there is no occasion to offer it in evidence unless the witness or counsel for the opponent wants it in." This principle was modified in *State v. Schlicher,* 230 Kan. 482, 490-94, 639 P.2d 467 (1982). There the admissibility of a tape-recorded statement of the defendant's accomplice was in issue. After cross-examining the witness concerning numerous contradictions and inconsistencies between his taped statement and testimony at trial, defendant moved to have the tapes admitted into evidence and played to the jury. The motion was overruled. In upholding that decision our Supreme Court formulated an abuse of discretion standard of review. 230 Kan. at 493. The court noted that the witness admitted making the prior inconsistent statements and defendant had ample opportunity to impeach the witness by pointing to specific inconsistencies. The court held· that playing the tapes to the jury "would not have added anything to the impeachment which had already been accomplished . . . ." 230 Kan. at 493-94. Accordingly it laid down general guidelines:

"Where an impeaching statement is written, and the witness, although admitting that he gave a statement, cannot remember the contents thereof or denies the same, the statement itself or at least the impeaching portion thereof should be admitted into evidence."

"Where a witness *admits* having made the contradictory statement, the witness is thereby impeached and further testimony or admission of the statement is ordinarily not necessary. It may be admitted, however, in the trial court's discretion, provided some good reason for its admission is shown." Syl. ¶¶ 4 & 5.

In the present case, defense counsel had ample opportunity to address the inconsistencies between the officers' testimony and their reports. The officers were given an opportunity to examine their reports and explain the inconsistencies. Under *Schlicher* it then became discretionary with the trial court to exclude the reports, or to admit them if "some good reason" were shown.

Although we fail to see how these reports were any more "prejudicial" to the State than any other documentary evidence, we cannot find that the trial court abused its discretion in excluding them.

Finally, defendant complains about the testimony of unendorsed witnesses. Since we are remanding for a new trial this point is moot.

Reversed and remanded for a new trial on all counts.