**Michael Keith MANN, and Gail Mann, Plaintiffs,**

v.

**Pat PURCELL, Individually and as the Undersheriff of the County of Sherman; Scott Harper, Individually and as a Police Officer in the Police Department of the City of Goodland; and the County of Sherman, a Kansas County, Defendants.**

**No. 86–1655–K.**

United States District Court, D. Kansas.

July 26, 1989.

Susan P. Selvidge, Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., for plaintiffs.

Mary Kathleen Babcock, Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., Gary K. Jones, Turner and Boisseau, Wichita, Kan., and Perry Warren, Goodland, Kan., for defendants.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

This case arises out of an incident which occurred on July 31, 1985 at a gas station off of Interstate–70 near Goodland, Kansas. On that date, plaintiffs Michael and Gail Mann were traveling through Kansas on their way to Oklahoma and stopped at the gas station of Leroy Baalman. After an altercation involving a rosebush and a credit card (as more fully described in the fact portion of this opinion), Michael Mann was arrested for disorderly conduct by Sherman County Undersheriff Pat Purcell.

The Manns subsequently brought the instant action pursuant to 42 U.S.C. § 1983 against the County of Sherman, Undersheriff Pat Purcell, Goodland City Police Officer Scott Harper, and gas station owner Leroy Baalman. Plaintiff Michael Mann claims the circumstances of his arrest and imprisonment violated his constitutional rights under the first, fourth and fourteenth amendments. Gail Mann argues only that her first amendment right to free speech was violated. Plaintiffs further allege pendent state claims of false arrest, false imprisonment, assault and battery, outrageous conduct, intentional infliction of emotional distress, and *prima facie* tort.

The court previously granted defendant Leroy Baalman's motion for summary judgment on the ground that Baalman was a private individual and as such did not act "under color of state law" as required by § 1983. *See Mann v. Baalman, et al.*, No. 86–1655–K, slip op. at 10, 1988 WL 166237 (D.Kan. Apr. 28, 1988). Currently before the court are the motions for summary judgment of remaining defendants Sherman County, Officer Purcell and Officer Harper.

The court heard oral argument on defendants' motions on June 12, 1989, and at that time indicated its intention to grant the summary judgment motions of defendants Sherman County and Officer Harper. The court deferred judgment, however, on the summary judgment motion of Officer Purcell. The court has since had an opportunity to thoroughly examine the briefs and supporting documentation filed by the parties, as well as to research and consider the relevant case law, and is now prepared to rule. Consistent with its statements at the hearing and for the additional reasons set forth herein, the court grants summary judgment as to each of the remaining defendants.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, this court must examine all evidence in a light most favorable to the

opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). Further, the party moving for summary judgment must demonstrate its entitlement beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim, but rather, must only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations, or denials, contained in its pleadings or briefs. Rather, the moving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegations. *Burnette v. Dresser Industries, Inc.*, 849 F.2d 1277, 1284 (10th Cir.1988). One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### Findings of Fact

Plaintiffs' version of the facts of this case differs substantially from defendants' version. Since the court is required, however, to consider the evidence in a light most favorable to the party opposing summary judgment, the following recitation of facts consists, unless otherwise stated, of plaintiffs' account of the events prompting this lawsuit.

On July 31, 1985, plaintiffs Michael and Gail Mann were en route from their family horse ranch in Oregon to the Quarterhorse World Championships at Tulsa, Oklahoma. The Manns, who were pulling a four-horse trailer, had been traveling with two other vehicles,[1] but became separated from the convoy near Denver, Colorado. Upon reaching Goodland, Kansas, the Manns decided to stop at the Quality Oil Service Station in order to refuel and look for the other vehicles. The owner of the station, Leroy Baalman, was the only person on duty when the Manns arrived.

Mr. Mann initially informed Baalman that he would be paying for the gas with a credit card and asked Baalman if the Manns could obtain water for their horses. Baalman agreed and pointed Mr. Mann toward the outside faucet and hose.

While Mr. Mann was watering the horses, Baalman emerged from the store and began yelling obscenities at Mr. Mann. Baalman claimed that Mann, in moving the hose to water the horses, had damaged a small rosebush located at the back of the station. The Manns and Baalman subsequently examined the rosebush together but disagreed as to the damage, if any, the rosebush had sustained. Baalman continued to yell obscenities at the Manns and the Manns became upset. Mr. Mann told Baalman, "you're sick, you need to see a psychiatrist, you're just nuts." (M. Mann Depo., pp. 104–05.)

Mrs. Mann and Baalman then went inside the station, where Baalman imprinted the Manns' credit card number on a receipt and wrote in the amount of the gas sale, but refused to permit Mrs. Mann to sign the receipt, saying that he would not accept the credit card. A somewhat heated discussion ensued between the two, with Mrs. Mann insisting that Baalman was obligated to take the card and Baalman insisting she pay cash. Mrs. Mann, not Baalman, eventually called the local police and informed them of the dispute.

After placing the phone call, Mrs. Mann returned to the counter and picked up her credit card which Baalman had placed on the counter. At that point, Mr. Mann came into the station and asked what was going on. Mrs. Mann informed him that Baalman had returned her credit card but would not return the imprinted receipts, and that the police were on their way. Mr. Mann, who was speaking in a "raised voice," asked Baalman "what the hell his damn problem was." (M. Mann Depo, p. 121.) Mr. and

---

**1.** Plaintiffs' 16–year old son was a passenger in one of the other vehicles in the caravan.

Mrs. Mann then walked outside the station to talk the matter over. At approximately the same time, Goodland Police Officer Scott Harper arrived with lights flashing and siren operating.

Both Mr. and Mrs. Mann approached Harper. Mrs. Mann, who was very emotional at this point, began relating to Harper the incident which had occurred and repeating in a raised voice all the profanity she had heard from Baalman. Mr. Mann claims that during this exchange Harper acted nervous and excited.

While the Manns spoke with Harper, three Sherman County sheriff's officers arrived in two additional vehicles.[2] After Deputy Doug Whitson got out of one vehicle, Mr. Mann went over and began speaking with Whitson about what had transpired. When the sheriff's deputies arrived, Officer Harper went inside the station to speak with Baalman. According to Harper, he went inside to get Baalman's side of the story because he wasn't able to reason with the Manns.

In the meantime, Whitson asked Mann if he would like to sign a complaint against Baalman, to which Mann replied, "I'm not interested in signing a complaint, but I'd like to take the son of a bitch (Baalman) out back behind the building for a few minutes." (M. Mann Depo., pp. 123, 413.) Deputy Whitson told Mann to "just calm down." (M. Mann Dep., p. 123.)

After speaking briefly with Baalman, Harper rejoined the group outside. Harper testified in his deposition that when he went in to the station to speak with Baalman, he knew that the Manns were claiming that Baalman would not accept their credit card. During his conversation with Baalman, he learned that some damage had been done to the rosebush by Mann but he does not recall what was said about the credit card. (Harper Depo., p. 32.) Baalman testified that he and Harper did not discuss the rosebush, but that Baalman did tell Harper that he (Baalman) refused to accept the Manns' credit card.

When Harper returned to the group, he approached Mr. Mann and advised him that "everything is okay, but Leroy [Baalman] won't take your credit card, he says you have to pay in cash." (M. Mann Depo., p. 132.) Harper's statement upset Mr. Mann and Mann "raised" his voice and "sternly" said, "[H]ey, wait a minute ... the man [Baalman] agreed to take the credit card, he put the fuel in on the pretense of taking the credit card, and he should have to take it." (M. Mann Depo., p. 134; G. Mann Depo., p. 144.) Mr. Mann also asked Harper how "everything could be fine" when the Manns, who were the complainants, were being asked to pay cash. Mann claims that after he said this, Harper got angry and started shaking, so Mann changed his tone and suggested that "maybe" Baalman should have to take the credit card. (Mann Depo., pp 134–35, 370–71.)

Moreover, when Officer Harper advised Mr. Mann that the Manns would have to pay cash, Mrs. Mann came over to "get her two cents worth in." (G. Mann Depo., p. 144.) Mrs. Mann advised Harper that Baalman had agreed to take their credit card and that he should now have to take it. Mrs. Mann admits that during this exchange, "all tempers rose," including those of her and her husband. (G. Mann Depo., p. 147.) Mrs. Mann heard Mr. Mann repeating to Harper the profane words that Baalman had used earlier. Finally, Mrs. Mann claims she stomped her foot and said, "We shouldn't have to be treated like this." (G. Mann Depo., p. 152.)

At this point, Undersheriff Pat Purcell, who apparently had only been observing the incident to this point, approached Mr. Mann, turned him around to face Purcell, and told him to calm down or he would be arrested for disorderly conduct. Mann responded, "[W]hy don't you back out of my face," to which Purcell responded, "I have a right to stand anywhere I want to stand." Mann then suggested "that could be (sic) very well be but you don't have a right to

---

**2.** At the time they were summoned to assist Officer Harper, the sheriff's deputies were assisting in traffic control at a parade in Goodland held in connection with the Sherman County Fair.

stand in my face and harass me." Purcell replied, "That's it, you had your chance," and directed Mann to put his hands on one of the officer's vehicles. (M. Mann Depo., p. 142.)

Purcell then arrested Mann and patted him down. Mann claims he did not resist arrest in any manner. He does admit, however, that immediately after the arrest he attempted to "move away" from the officers. (M. Mann Depo., p. 158.) Mann was subsequently arrested for resisting arrest.

As the arrest was taking place, Officer Purcell allegedly advised Mrs. Mann to "shut up or we're going to slap your ass in jail." (M. Mann Depo., p. 159.) Mrs. Mann was frightened by this threat and claims she stopped speaking until Officer Purcell left with her husband.

Mann was transported by Undersheriff Purcell and Deputy Bishop to the jail. After going through the normal booking process, Mann was offered a phone call to which he claims to have responded that he needed a few minutes to think about who he should call. While going back to his cell area, Mann alleges Officer Purcell shoved him forward down the hall.

During his night in jail, Mann claims he was denied several requests to make a phone call.

The following morning, Deputy Purcell appeared at a hearing before Judge Burr, who found that probable cause had existed to arrest Mann. Mann was then brought before the judge, who decided to release Mann on his own recognizance. The charges against Mr. Mann were subsequently dismissed.

As stated, the officers' recollection of what happened at the gas station varies materially from Mr. and Mrs. Mann's recollection of the chain of events. All of the officers described Mann's conduct as loud, aggressive and offensive. The officers claim that when Officer Harper suggested to Mr. Mann that the dispute could be resolved if the Manns were to pay cash, Mr. Mann became extremely upset, yelled obscenities at the officers and was shouting so loudly he could not hear what Officer Harper was saying.

The officers claim that when Officers Whitson and Purcell told Mann to "calm down" or he'd be arrested, Mann not only did not heed these warnings but told Purcell "fuck you," called Purcell a "son-of-a-bitch" and shoved him. (Whitson Depo., p. 59; Bishop Depo., pp. 52–52; Purcell Depo., p. 184.) It was at that point that Purcell arrested Mann for disorderly conduct. When Purcell raised his left hand to take hold of Mann's right arm, Mann knocked Purcell's hand away and said, "Fuck you, I'm not going anywhere with you." (Whitson Depo., p. 60; Purcell Depo., p. 184.) Mann was then arrested for resisting arrest.

## Conclusions of Law

### A. Liability of Sherman County

The first issue is whether the court may find as a matter of law that under 42 U.S.C. § 1983 defendant Sherman County is not liable for Sheriff Purcell's actions.

In *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that *respondeat superior* or vicarious liability will not attach to a municipality (or county) under § 1983. Rather, a county can be liable under that section only when the county itself causes the constitutional violation at issue. The Court held "[i]t is only when the execution of the government's policy or custom ... inflicts the injury that the municipality may be held liable under § 1983." *Id.*, at 694, 98 S.Ct. at 2037–38.

Thus, in deciding whether Sherman County may be liable in this case, the court must determine whether plaintiff has alleged any facts showing "a direct causal link between a [county] policy or custom, and the alleged constitutional deprivation." *City of Canton, Ohio v. Harris*, —— U.S. ——, ——, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412, 424 (1989).

In support of their claim against Sherman County, plaintiffs rely solely upon allegations that Undersheriff Purcell is a

"policymaking official." [3] Plaintiffs apparently reason that any action by a policymaking official is sufficient to confer governmental liability under § 1983. Plaintiffs thus conclude that because Purcell was a policymaking official, his allegedly unconstitutional arrest of Mann was an "official act" for which the county is liable.

■ This argument ignores, however, *Monell's* requirement that in order for liability to attach, there must be a county "policy or custom" which caused the plaintiffs' constitutional deprivation. Thus, even if Mann was arrested without probable cause by a policymaking official, plaintiff has failed to point the court to any facts which would suggest that the county had an "official policy or custom" of permitting officers to make arrests without probable cause.

Plaintiffs attempt to rely on *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), where the Supreme Court approved a finding of municipal liability under § 1983 for a single, one-time illegal action or decision of a policymaking official. In that case, a county prosecutor authorized sheriff's deputies to break down a door at a doctor's clinic in order to serve subpoenas on witnesses employed there, despite the fact that the officers had no search warrant to enter the premises. The Supreme Court held the county liable for the prosecutor's action, concluding that "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." 475 U.S. at 483, 106 S.Ct. at 1300.

When the facts of the present case are contrasted to *Pembaur*, it is clear that Undersheriff Purcell was simply an officer making an arrest and not a "final" policymaking official who "established" a policy which resulted in an alleged constitutional violation. *Pembaur* does not stand for the proposition that every act of municipal officers with final authority to effect or authorize arrests and searches represents the policy of the municipality. Rather, as Justice White explained in a concurring opinion:

Where the controlling law places limits on their [law enforcement officers'] authority, they cannot be said to have the authority to make contrary policy....

Such results would not conform to Monell and the cases following it.... **A sheriff, for example, is not the final policymaker with respect to the probable-cause requirement for a valid arrest. He has no alternative but to act in accordance with the established standard; and his deliberate or mistaken departure from the controlling law of arrest would not represent municipal policy.**

475 U.S. at 486 (emphasis added).

■ Thus, even if it is ultimately determined that Officer Purcell has policymaking authority, and that in arresting Mann Purcell departed from the established probable cause standard, the county may not be held liable because plaintiffs have failed to point the court to any facts which establish that Officer Purcell, as a policymaking official, made a deliberate choice to arrest Mann without probable cause. Moreover, the court is not certain that plaintiff could ever establish a "policy or custom" of arresting without probable cause since law enforcement officers have no choice but to follow the law, which requires that the officer have probable cause in order to make a valid arrest.

Accordingly, the court grants defendant Sherman County's motion for summary judgment.

## B. *Officer Scott Harper*

Goodland City Police Officer Scott Harper argues summary judgment is proper as

---

**3.** The question of whether Officer Purcell is a "policymaking official" must be determined by reference to state law. While the parties spend a great deal of time debating this question, the court need not decide whether Purcell is a "poli-cymaker" under state law. As discussed above, even assuming Purcell is a policymaker for the county, plaintiffs' claim against the county must fail.

to all claims against him because the facts, even when viewed in a light most favorable to plaintiffs, show that Officer Purcell, not Officer Harper, arrested Mann and took him to the county jail. Defendant Harper argues that while he did arrive at the service station first and speak with both the Manns and Leroy Baalman, he was not involved in Purcell's arrest of Mann and therefore he cannot be liable under § 1983.

Plaintiffs point out that Harper may be liable under § 1983 if he fails to perform a duty and that failure causes a deprivation of constitutional rights. *Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423, 1433 (10th Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 65, 88 L.Ed.2d 53 (1985). Specifically, plaintiffs assert that Officer Harper had a duty to intervene[4] in the allegedly unlawful arrest of Mann because Harper "was the only officer who had knowledge both before and after the arrest that the Manns were being wronged by Baalman." (Plaintiffs' Response to Defendant Harper's Summary Judgment Motion, p. 10.)

Plaintiffs' argument is contrary to the uncontroverted facts. Officer Harper spoke with the Manns when he first arrived on the scene. When he was unable to "reason with the Manns," he went inside to talk with Baalman. After his discussion with Baalman, Harper advised the Manns that everything was "okay", but that they would have to pay cash. The evidence does not indicate that Harper believed this to be an unreasonable request on the part of Mr. Baalman. Nor do plaintiffs contend that Harper was **required** to force Baalman to accept the Manns' credit card.

The facts indicate that Harper briefly investigated the circumstances of what had happened and then attempted to resolve the dispute by advising the Manns that

they would have to pay cash. The Manns suggest, however, that Harper should have more thoroughly investigated the matter, that he should have found Baalman's demands to be unreasonable and required him to accept the Manns' credit card, and further, he should have prevented Mr. Mann's arrest for disorderly conduct.

■ The court finds no evidence to support the plaintiffs' assertion that Harper had knowledge that "the Manns were being wronged by Baalman." More importantly, Mr. Mann was arrested for disorderly conduct—not for theft of gas. While Harper may have had a duty to intervene if Purcell had arrested Mann under the mistaken belief that Mann was refusing to pay for the gas,[5] he had no duty to intervene in Mann's arrest for disorderly conduct and he cannot be held responsible for Mann's allegedly unlawful arrest. Since all of plaintiffs' claims with respect to defendant Harper are related to the alleged unlawful arrest of Mann, defendant Harper's motion for summary judgment is granted.

### C. *Undersheriff Pat Purcell*

#### (1) Unlawful Arrest

Finally, the court must consider whether summary judgement is proper as to Undersheriff Pat Purcell. While Mr. Mann makes numerous claims against Officer Purcell, his primary claim is that he was arrested without probable cause in violation of his fourth amendment right to be free from unreasonable searches and seizures.

Initially, the court must consider Officer Purcell's argument that he is entitled to qualified immunity from suit because his actions in arresting Mr. Mann were based

---

**4.** In addition to their assertion that Harper had a duty to intervene in Mann's arrest, plaintiffs also suggest that Officer Harper may be liable for directly participating in the arrest. In support, plaintiffs rely upon the testimony of Officer Whitson that immediately prior to Mr. Mann's arrest by Purcell, Whitson heard Harper tell Mann he was under arrest. (Whitson Depo., pp. 54–55.) Plaintiffs themselves have unequivocally asserted, however, that it was Officer Purcell, not Officer Harper, who arrested Mr.

Mann, and the court will not permit them to argue otherwise here.

**5.** Plaintiffs assert that "[c]ircumstantial evidence suggests the officers thought the Manns were attempting to drive away without paying for the gas." (Plaintiffs' Response to Defendant Harper's Motion for Summary Judgment, p. 9) Plaintiffs fail, however, to point the court to any facts to support this allegation.

on probable cause and were objectively reasonable.

Under *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), public officials are liable for civil damages only when their conduct violates a clearly established constitutional right of which a reasonable person would have known. Only when no reasonable person would believe that the acts of the defendant official were lawful in light of clearly established law will the official be unprotected by immunity.

Whether an individual has been unlawfully arrested without a warrant depends upon whether the arresting officer had probable cause to arrest. *Karr v. Smith,* 774 F.2d 1029, 1031 (10th Cir.1985). Thus, in a case of alleged unlawful arrest, officers will lose the shield of immunity only if reasonable officers could not have believed that the arrest was based on probable cause, in light of clearly established law and the information possessed by the officer. *Jones v. City and County of Denver, Colorado,* 854 F.2d 1206, 1210 (10th Cir. 1988). *See also Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Probable cause exists where the facts and circumstances within an officer's knowledge, and of which he had reasonably trustworthy information, are sufficient to warrant a prudent man in believing that an offense has been or is being committed. *Karr v. Smith,* 774 F.2d at 1031.

Defendant Purcell argues that when the totality of the circumstances are examined in this case, it is clear that probable cause to arrest Mr. Mann existed and Officer Purcell's actions were objectively reasonable, entitling him to qualified immunity. Plaintiffs, on the other hand, insist that if the court assumes the plaintiffs' version of the facts to be true, it must conclude that no reasonable officer could believe probable cause existed to arrest Mr. Mann.

The court finds that even when the facts are considered in a light most favorable to plaintiffs, defendant Harper is entitled to qualified immunity.

K.S.A. 21–4101, the disorderly conduct statute, provides in relevant part:

Disorderly conduct is, with knowledge or probable cause to believe that such acts will alarm, anger or disturb others or provoke an assault or other breach of the peace:

(a) Engaging in brawling or fighting; or

. . . .

(c) Using offensive, obscene, or abusive language or engaging in noisy conduct tending reasonably to arouse alarm, anger or resentment in others.

Kansas courts have construed the disorderly conduct statute to require the utterance of "fighting words" if speech alone is used to support a conviction. *State v. Huffman,* 228 Kan. 186, 192, 612 P.2d 630 (1980); *State v. Heiskell,* 8 Kan.App.2d 667, 670, 666 P.2d 207 (1983). What is disorderly conduct depends upon the totality of the circumstances in any given case. *State v. Beck,* 9 Kan.App.2d 459, 462, 682 P.2d 137 (1984).

In *Beck,* the Kansas Court of Appeals upheld the trial court's finding that the defendant's words were in fact "fighting words." The court found "significant" defendant's offer to fight ("Come up here and I'll fuck with you"), his resistance to the officers' attempts to restore tranquility to the domestic scene, the provocative nature of the words themselves, as well as the fact that the addressees were police officers. 9 Kan.App.2d at 463, 682 P.2d 137.

In the instant case, Mann concedes that he told Officer Whitson that he [Mann] would like to take "that son of a bitch [Baalman] out back for a few minutes." He further admits that when Officer Harper attempted to resolve the dispute by suggesting that the Manns pay cash for the gas, Mr. Mann became upset, raised his voice and challenged Harper, suggesting that Baalman should be forced to accept the Manns' credit card. Finally, he admits that when Officer Purcell advised him to calm down or be arrested, Mann said to Purcell, "Why don't you back out of my face."

Mrs. Mann admits that while Harper and her husband discussed whether Baalman

should have to take the Manns' credit card, "all tempers rose," including her husband's. She also concedes that at that point she joined the commotion in order to add "her two cents worth." Her "two cents" included stomping her foot and insisting that Baalman be made to take the Manns' credit card. Finally, Mrs. Mann confirmed that she heard her husband repeating to the officers the profanity used by Baalman.

Thus, the uncontroverted facts are that when the officers attempted to resolve what appeared to them to be a misunderstanding, Mr. Mann became hostile, directed profanities at Baalman, repeated the profanities used by Baalman, and insisted that Baalman be required to take their credit card. When both Officers Whitson and Purcell told him to calm down, Mann voiced what reasonably could have been considered a threat to Officer Purcell, saying, "Why don't you get out of my face." Further, Mann admits that after his arrest he attempted to move away from the officers. Under these circumstances, the court holds that reasonable officers could have believed that Mann's arrest for disorderly conduct/resisting arrest was supported by probable cause. Accordingly, the court finds that Officer Purcell is entitled to qualified immunity and summary judgment is therefore granted as to plaintiff's claims of unlawful arrest.

### (2) First Amendment Claims

The court finds summary judgment appropriate as to Mrs. Mann's claim that defendant Purcell violated her first amendment right to free speech. She suggests that this abridgement occurred when she was allegedly told by Officer Purcell to "shut up or he would slap her ass in jail." The court finds that plaintiff has failed to make any showing that Purcell's words silenced her alleged "speech" or suppressed her first amendment rights.

Further, the court finds summary judgment appropriate as to plaintiff Michael Mann's claim that his arrest "impaired, infringed and abridged" his freedom of speech. (Amended Complaint, p. 3, ¶ 9.)

Mr. Mann's only attempted explanation of the basis for this contention is "the Free Speech issues are entwined with the false arrest issues." (Plaintiffs' Response to Defendant Harper's Motion for Summary Judgment, p. 14.) Plaintiff has entirely failed to support his burden to come forward with specific facts showing a genuine issue for trial as to this issue and summary judgment must be granted.

### (3) Unconstitutional Confinement

Without the benefit of authority, plaintiff Michael Mann also claims that the "conditions" of his confinement were unconstitutional. Specifically, plaintiff alleges he was "assaulted" because he was jailed with a prisoner incarcerated for assault of a police officer; he was not given *Miranda* warnings; he was refused a phone call; he was "shoved" by Officer Purcell; and Officer Purcell "harassed and humiliated" him during the booking procedure and threatened to prevent his release on bail.

The facts indicate that Mr. Mann was given an opportunity to make a phone call but could not decide who to call. Moreover, plaintiff cites no authority to support the proposition that even if he was deprived of a phone call, such a deprivation would constitute "unconstitutional confinement." As for Officer Purcell's alleged failure to read Mann the *Miranda* warnings, the record does not indicate that any officer ever attempted to interrogate Mr. Mann. Thus, no constitutional violation could have occurred. Nor does plaintiff explain how being placed in a cell with someone jailed for assaulting a police officer violated Mann's constitutional rights. Finally, Mann fails to offer any explanation or authority for the proposition that the humiliating statements and "shove" allegedly made by Officer Purcell constituted an unconstitutional condition of confinement or use of force.

Thus, plaintiff's assertion that he was subjected to unconstitutional conditions of confinement must also fail, and summary judgment is granted as to those claims.

Because plaintiffs' § 1983 claims must be dismissed as a matter of law, the court

declines to exercise pendent jurisdiction over plaintiffs' state law claims of false arrest/false imprisonment, assault and battery, outrageous conduct, intentional infliction of emotional distress and *prima facie* tort. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

IT IS ACCORDINGLY ORDERED, this 26th day of July, 1989, that defendants' motions for summary judgment are granted.