NOT DESIGNATED FOR PUBLICATION

No. 125,215

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

RAFAEL PEREZ,
*Appellant*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; CHRISTOPHER M. MAGANA, judge. Submitted without oral argument. Opinion filed May 17, 2024. Affirmed in part, reversed in part, and remanded with directions.

*Sam S. Kepfield*, of Hutchinson, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.


Before HILL, P.J., SCHROEDER, J., and MARY E. CHRISTOPHER, S.J.

PER CURIAM: After trial in September 2019, the jury convicted Rafael Perez of attempted murder in the second degree; aggravated battery; two counts of criminal discharge of a firearm; aggravated assault; and criminal possession of a weapon by a convicted felon. Perez appeals his convictions arguing the trial court erred by (1) refusing his requested self-defense instruction on the charges of attempted second-degree murder and aggravated battery, (2) refusing to give his requested attempted voluntary manslaughter instruction, and (3) failing to advise him of his right to a jury trial when he stipulated to several elements of criminal possession of a weapon by a convicted felon.

1

We have determined, based on a review of the evidence, that Perez' request for a self-defense instruction on the charges of attempted second-degree murder and aggravated battery was not factually appropriate and properly denied. Similarly, the instruction on attempted voluntary manslaughter Perez requested was not factually appropriate and was properly denied. As to Perez' stipulation to elements of the convicted felon in possession of a weapon charge, the district court accepted the elemental stipulation without a jury trial waiver. We find nothing in the record indicates whether the failure to get a jury trial waiver would have impacted Perez' decision to enter the stipulation. Thus, the failure to obtain a sufficient jury trial waiver cannot be deemed harmless, and his conviction for criminal possession of a firearm by a convicted felon must be reversed and remanded. We affirm in part, reverse in part, and remand.

FACTUAL AND PROCEDURAL HISTORY

Following a shooting on October 21, 2017, Perez was charged in an amended complaint with attempted murder in the second degree of Brandon Young, a severity level 3 person felony; aggravated battery against Brandon Young, a severity level 4 person felony; three counts of criminal discharge of a firearm against Chad Walker, Laveay Nicholson, and E.G., severity level 7 person felonies; aggravated assault of Scott Pinaire, a severity level 7 person felony; and one count of criminal possession of a weapon by a convicted felon, a severity level 8 nonperson felony.

Perez' case was tried before a jury in Sedgwick County District Court from September 23 through 26, 2019.

Officer Thomas Wallace of the Wichita Police Department testified that on October 21, 2017, at about 6:45 p.m., he was dispatched to the location of a shooting in Wichita. When Wallace arrived, a man told him his friend had been shot. He took Wallace into his house to help the injured friend. On the way into the house, Wallace saw

2

a trail of blood leading into the house and a substantial pool of blood inside the kitchen area. Wallace denied observing any weapons inside of the home. He said he saw an injured man, Young, lying on the floor with a towel over his head. Upon inspection, Wallace found that Young had a gunshot entry wound on the right side of his neck and exit wound under his left eye. Young was still conscious but said he did not really remember what occurred. Wallace called EMS and went with Young to the hospital in case Young made any more statements and to follow his medical condition.

*Aggravated Assault Charge*

Pinaire testified that, on October 21, 2017, he was at his home. He came outside when he saw a white SUV coming through the alleyway. Believing the vehicle belonged to his friend, Pinaire flagged down the SUV and started to walk across the alley. When he started walking toward the person, the person said, "step back, I'm strapped, I don't have my kid with me." Pinaire identified Perez as the person inside the vehicle. Pinaire could see inside the vehicle and saw that Perez was holding a black semi-automatic gun, showing it to him. Pinaire testified he turned away and walked back into his house because he felt threatened and scared by Perez brandishing his weapon towards him. Pinaire denied having seen or known Perez prior to this incident and denied having any weapons on him when he approached the vehicle.

Pinaire testified that he went inside and called Nicholson, his neighbor, to warn him not to go outside because someone had a gun out there. Shortly after hanging up, Pinaire testified he heard "more than a few" gunshots, meaning "eight or nine." Pinaire laid down in his bathtub because he did not know if the shots were directed toward his house. Later, Pinaire went outside and saw EMS taking Young out of Nicholson's house. When an officer approached Pinaire, he told them about what happened with Perez.

3

Maria Feliciano had three children with Perez and was pregnant with their fourth child at the time of the shooting. She testified that she and Perez were living in separate houses, about a three-minute drive apart, but they were still seeing each other. On October 21, Maria and the children had gone to Perez' house to do laundry. Perez had been drinking liquor that afternoon and was lashing out and yelling at her. She left Perez' house with the two older children and left their six-month-old son with Perez. Maria said Perez called her, upset that she had left, and was cussing her out.

Maria testified Perez drove to her apartment, which is in the same complex as Nicholson's. When Perez came to her door, he wanted her to go out to the parking lot to get the baby, who was in a car seat. In the parking lot, Perez was calm at first, but then he started lashing out and cussing. She said it was getting loud, but she was able to get the baby and get back to her apartment. As she walked back to her apartment, she saw some guys start to come out of houses. Two men, one white and one Black, approached Perez in his vehicle. Maria took the baby inside and then came back out on her porch.

She heard Perez argue with the men about blocking him in a couple days prior. Maria explained that, a day or days before the shooting, Perez and she were driving around and a guy had blocked him in, and one of the men asked Perez if he was a "chimo or something" because he kept driving around the area. The guy told Perez he was a chimo and that he had kids, and Perez responded that he had children too. She said Perez let the man know he was "Mexican mafia." Maria said she did not know if the men who approached Perez' Yukon were involved in that incident a few days earlier or if they were friends with those men. On cross-examination, Maria denied that the man who blocked Perez in previously was the white man from this incident.

As she was standing on her porch, Maria said there was a confrontation between the white man and Perez. She heard the white man tell Perez to "get out" and "pussy, get out." On cross-examination, Maria agreed this was threatening, asking Perez to come out and fight. She also said the white man was the only person near Perez' vehicle when this occurred. When she saw the white man going toward Perez' car, she told him to "get the hell out of there" because she did not know if Perez had a weapon or "if it was safe for them to even be at the Yukon." Maria said, "they got out of there and they weren't outside anymore," except Perez. She confirmed there really was only one guy that she saw walk away.

Maria said that Perez continued to sit outside in his vehicle for "some time" while she stood on her porch. As she was standing on the porch, Maria testified she saw Perez in the Yukon, "[a]nd then I saw him shooting off the gun." She did not see anyone around the Yukon when Perez fired, and she did not see anyone else firing a firearm. According to Maria, Perez fired more than six times.

Laveay Nicholson testified that in October 2017, he lived in a five-plex building with his friend Brandon Young. Nicholson testified that his family owned the apartment complex, and he managed it so he knew the tenants, including Maria's mother, but he did not know Maria very well. Nicholson testified that he figured out a few days before the shooting that Perez "belonged to the third apartment." He learned this because, a few days prior to the shooting, Nicholson and a friend were outside grilling, and Perez was driving repeatedly and erratically up and down the alley. Nicholson told his friend not to say a word, and they did not interact with Perez.

On the day of the shooting, Nicholson recalled talking to Maria's mother, who told him she was going to go "rescue" her daughter. Later that afternoon, Nicholson was in his apartment and saw on the surveillance system that Perez and Maria were tugging over a baby carrier, going back and forth, and Perez was calling her a bitch. He stated that

5

Pinaire called him and asked if he saw what was going on. Nicholson testified he went outside to watch but did not say anything, hoping his presence would make Perez stop yanking the baby carrier around. Nicholson testified that no one else came outside with him at first, though Young and Walker were in his apartment.

Nicholson testified that he was fiddling around with his barbecue grill and straightening up when Perez said something to him about having blocked in his car, and Nicholson responded, "I didn't block your car in." He said he did not say much because Perez was irritated, and they were about 30 feet apart when this exchange occurred. When asked, Nicholson said that, the day before, people had been coming in for a picnic he held and were parking near Perez and maybe he was thinking of that. Nicholson denied knowing if anyone had blocked in Perez.

As this occurred, Nicholson said that Maria had a chance to get away and went inside her house and that Perez was hollering and screaming at him. Nicholson testified he said nothing, and then Walker and Young came outside. Nicholson said he told Young not to say a word, but Walker has a big mouth and he engaged with Perez. When Young said something about Perez being "nothing but a bitch," Nicholson told Young to shut up, but Perez and Walker kept going back and forth with insults. Nicholson testified Walker got about 15 feet from Perez and was "run[ning] his damn mouth." He said Perez was in the space between the door and opening and was going in and out of the car. Nicholson said he knew Perez was getting volatile and "was going after something" in his truck. Nicholson testified Perez was saying "Mother fucker, I will shoot you" and "I will blow your fucking head." Nicholson said Walker and Perez were cussing at each other, but Nicholson denied that Walker threatened Perez. Nicholson told Walker to get inside. At that time, Walker was closest to Perez, then Nicholson, and then Young was furthest away.

6

Nicholson testified he grabbed Walker to drag him back home and could see over his shoulder that Perez went to his car and retrieved his gun. They started to run, and Nicholson said they were about 35 feet from Perez when he heard the first shot. Nicholson testified that Perez' third or fourth shot hit Young, and he grabbed Young and brought him into the house. Nicholson described locking the door and putting a towel around Young's head while Walker ran around screaming and calling 911. Nicholson said they heard Perez start to shoot again, they were defenseless, and he "hit the floor." At some point, Nicholson looked out the window and saw Perez was still shooting and coming toward the house, and then saw him drive down the street and start shooting again. Nicholson thought Perez fired his gun 15 or 18 times, but he stopped counting. He denied that he, Young, or Walker had any weapons on them when they went outside, though on cross-examination he confirmed he had told a detective his nephew's realistic looking toy guns may have been in the home. Nicholson said that Walker may have said something about VLB—a gang that some of Young's friends were in—but Nicholson testified he does not belong to that or any other group.

Chad Walker testified that on October 21 he, Young, and Nicholson were at Nicholson's residence hanging out and drinking. He recalled that Nicholson went outside and they heard him yelling. Walker said he went out the backdoor to see what was going on and saw Perez "right up in [Nicholson's] face, screaming at him, kind of had his hand up, threatening him," and Nicholson was backing up a bit. On cross-examination, Walker testified Nicholson was telling Perez to leave Maria alone, but he denied that his voice was raised. Walker said he started yelling at Perez, asking "what the fuck are you doing?" and telling him to "[g]et out of here." On redirect examination, Walker confirmed that he may have gotten closer to Perez than Nicholson, but he was not completely sure.

Walker confirmed that Perez directed his attention at Walker when he came outside, and Nicholson started yelling for Young to come out. Walker testified he was saying, "stay the fuck out of here. You have no business here, whatever." Walker said

Perez probably "didn't know if he was going to be outnumbered or what was going to happen. So [Perez] started walking back towards the gate, like he was going to leave." Walker said he walked Perez all the way to the gate while they were yelling, and then Perez exited the gate and walked to his white SUV "all calm." Walker thought he was going to drive off, but instead Perez started digging in the center console. Walker confirmed that he, Young, and Nicholson all stayed inside the boundary of the fenced yard.

Walker said it took a few seconds for him to understand what was about to happen, but he turned around and took one or two steps toward the house when "all of a sudden bullets started flying at me. I remember reaching the big tree right in front of me, like the bark was exploding in front of it." Walker said he took off running, but Young was outside at that point too and was running toward him. Walker testified that Young turned around and was running back toward the house, but "he didn't make it in time because a bullet hit him in the back of his neck and came out his eye."

Walker recalled that Young fell and knocked over two trash bins. He and Nicholson dragged Young inside and called the police. Walker recalled that Perez shot at them four or five times while they were outside. Once they were inside, he thought Perez had left, but about 10-15 seconds later, while they listened to instructions from 911, Perez' SUV came back and started shooting at the house again. He thought Perez shot 7 to 10 more times and recalled lying on the ground while it happened.

Walker denied saying "VLB" and confirmed that "someone might have" said it, but he could not recall. He also denied that he, Nicholson, or Young brandished a weapon or told Perez to get out and fight. He testified that he had previous convictions for burglary and theft.

8

Brandon Young testified that on October 21 he was living in Wichita with his friend Nicholson. He and Walker were at his house doing scratch tickets when they heard a neighbor and then Nicholson scream. He and Walker went outside and saw Nicholson and Perez tossing words back and forth, and they were a couple feet apart from each other. Young testified that Walker was drunk and on pills and started yelling very loudly.

Young told Perez to leave if he knew what was good for him. Perez grinned at him in response. Young said this gave him a gut feeling that Perez had a gun, and he told Walker they should leave. Young testified that he turned and was walking back to the house, but as he took his first step, he was shot. He started to run but fell. Young heard about three shots during this first round. Once they were inside his residence, Young recalled Nicholson and Walker wrapping something around his face and head to stop the bleeding and Nicholson telling Walker to call the police. Once inside, they heard 9 to 12 more shots.

Young said the bullet entered behind his right ear and exited his left cheekbone, causing his left eye to explode. As a result of his injuries, Young testified he was in the hospital for five days; the left side of his face is numb; and his tongue was clipped, causing him to have difficulty talking.

Young denied that he, Walker, or Nicholson had any weapons, but he said Nicholson's eight-year-old nephew had a lot of toy guns in the residence. On cross-examination, Young testified the toy guns are black and have an orange cap on the front. He could not recall if anyone said anything about the VLBs, but Young said it might have been mentioned as a warning to Perez to leave. On redirect examination, Young denied that he or Walker were members of the VLBs. On cross-examination, Young testified that he had previously been convicted of forgery, petty theft, and burglary.

9

Joseph Westphal, a crime scene investigator for the Wichita Police Department, testified that he was asked to go through Perez' vehicle. Inside of the vehicle, Westphal found two shell casings located on the rear driver's side of the vehicle, more casings in the rear near a document with Perez' name on it, a casing on the front hood near the wiper blades, and a live round between the driver's seat and center console. In total, Westphal found four casings and one live round in Perez' vehicle.

Hannah Holley testified that she was a crime scene investigator for the Wichita Police Department and was called to St. Francis Hospital to take photos of Young on October 21, 2017. After that, she went to Nicholson and Young's apartment to document the crime scene, collect casings, and document defects to the residence. Holley testified she found three 9 mm casings near a white car in the parking lot. Holley also documented "defects" to the exterior of the residence, including several defects that were consistent with bullet strikes. In total, Holley found nine defects to the exterior of the home consistent with bullet strikes, and she found a pellet gun on the couch in the living room, which she denied had an orange tip.

Christopher Engle-Tjaden testified he is a crime scene investigator with the Wichita Police Department and was asked to search Perez' residence for the firearm used in the shooting. He testified he documented the firearm they found on top of a tall hutch. He explained that the firearm was unloaded, there was a magazine with 12 rounds in it, and an empty magazine on top of the hutch. The firearm was a Taurus Millenium g2 which uses 9 mm ammunition, the type of ammunition found alongside the gun.

Erik Guzman testified he was a detective on the gang and felony assault unit of the Wichita Police Department and was assigned to investigate the shooting and to interview Perez. He said they brought Perez into the police station the night of the shooting and attempted to interview him, but when Detectives Guzman and Matthew Balthazar stepped into the room, Perez was just waking up and smelled of alcohol, was unable to answer

10

simple questions, and was not in a good state for an interview. They decided to wait and interviewed Perez on October 23, 2017.

Detective Guzman explained he recorded the interview between himself, Detective Balthazar, and Perez with an audio recorder. After listening to the recording at trial, Guzman testified the live round found in the front seat of Perez' vehicle was consistent with Perez' statement about clearing the jammed gun to reload another magazine or clip. Guzman said Perez described shooting out of his driver's window and then out of the passenger window.

On cross-examination, Detective Guzman testified he used a database to determine none of the men involved were members of the VLBs. However, there appeared to be some sort of gang graffiti in Young and Nicholson's residence, though he had no idea who put it there or if it had anything to do with this case.

*Audio Recorded Interview of Perez at the Jail*

In the audio recorded interview with Detectives Guzman and Balthazar, Perez said that two or three days before he had taken Maria and their kids to Maria's residence, and when he pulled up, there were neighbors outside looking at them. He said a bunch of the neighbors from across the street, including one with a red Camaro, a Black guy, and a bunch of white guys, blocked him in the driveway and were shouting about the VLBs. Perez said he told the men who he was, where he was from, and that he did not gang bang anymore. Perez said that his wife got scared and told him to drive away and that the guys were yelling and asking if he was a child molester. Perez said he took off, but the men followed in their cars to his house. Perez said he saw the neighbors parked outside of his house, and he told Maria to get her gun and to call the police, but she refused to call. Perez said the men were making threats, saying they were going to get his ass, calling him "chomo" or "homo" and "rapist." Perez said Maria wanted to go home, so he took her

11

home, but the neighbors were sitting outside at her residence in a red Camaro and other trucks. He left but then went back to Maria's house to spend the night and make sure she had her weapon. He said he heard the guys go behind her house that night, and he thought he saw them looking into her windows.

Perez told the detectives that the next morning he took his daughter to school and then Maria came to his house to do laundry. Perez said he bought some tequila, drank two shots, and fell asleep, which Maria did not like. So, she woke him up and told him she was going home. However, Perez noticed that she left their infant son and weapon at his house, which he had put in the diaper bag. He said they had gotten her the firearm in August because the guys had been messing with them, but he also said she had only moved to her apartment two weeks before the incident. He later said she bought the firearm because she was living in Plainview and people were trying to come in her house to mess with her because of Perez.

Perez said he took the child to Maria's house, but when he drove up one or two guys rushed him. Perez said he told them to back up and leave him alone or he would call the police. He later explained that he had parked where he usually does, in the alley behind the residence, and he was beside a white car. He went through the gate to give Maria their son, but a guy tried to "come up on me" and he had "no idea" what the guy was doing, and the man said he thought Perez was "some dude" or something. A detective asked if Perez pulled out his gun when this man came up looking for his friend. Perez stated that he was getting out of the truck, he did pull out his gun, and he told the man "dude, I got a gun on me man. You better get out of here." Perez denied pointing the gun at the man and said he was just holding it because the man thought he was kidding about the gun and kept walking toward him. Perez said he could easily grab the gun from the diaper bag in the back seat and that he put it back in the diaper bag after the man left. He said that he was "in fear of my life as soon as I got there."

When Perez got to Maria's door, he noticed that she was standing inside "all scared." He knocked on the door and could see her hesitate to open it, and so he kept knocking. He saw she had her phone in her hand like she was going to call the police, surmising that the neighbors were messing with her while he was gone. Perez said she finally opened the door and took their child, and he told her he would go get the diaper bag. Perez denied that there was a tugging match over the baby.

Perez started to go to the car to get the diaper bag, but "all those guys tried to come out and get me." Perez said the guys "kept coming out and coming out" and were yelling "this VLBs bitch" and "fuck you." Perez got the gun from the diaper bag in the back seat and put it into the center console so it was within easy reach. Perez stood quietly for a moment and then saw the guys start coming, so he took the gun out of the diaper bag that was behind the driver's seat and fumbled his keys out to try to leave. He said the men were getting closer to the gate and grouping all around him, and so he started shooting because he "felt my life was in danger" like the day before. Later, Perez said there were "like eight or nine" men coming at him from behind and around the corner. They were behind the fence that surrounds the apartments, the gate was shut, and they were about 15 feet from the vehicle. Perez stated when he saw the men, he thought about turning his car on and leaving but he saw "somebody had something or something" and he thought they were going to start shooting. When the detective asked him to clarify what they had, Perez said he did not remember, and it was just all of them and they started shouting "VLBs."

When the detective asked if the men were still 15 feet away when Perez began shooting, Perez said they were coming closer and closer to him while he was inside the vehicle with the door closed. Perez took out his wife's gun and started shooting from inside of the vehicle, but it jammed after four or five shots. He said he was not shooting to try to kill the men but was just shooting in a general direction. The detective described the motion Perez used, confirming that he was holding the gun in his right hand and

13

across his body to shoot out of the driver's window. Perez said that the men took off back toward the residence after he started shooting.

When the gun jammed, Perez said he got out the other clip and loaded it. While he was loading the clip, Perez said his truck would not move and so he started shooting again. He said he saw the curtains moving in one of the residences and thought they were pointing something at him, so he started shooting again towards the residence but that he was shooting high out of the front passenger window. Perez said he was then able to drive away.

Although he considered going to a police station, Perez decided to go home and put the gun away, changed his clothes, and started "pounding the bottle of tequila." He said that he changed his clothes to get ready to go to jail because he knew the police were going to come.

Perez denied that he was trying to kill anyone when he was shooting the gun and that he was shooting to the left of the men. The second time he shot toward the apartment because "supposedly they were grabbing something or doing something." When the detective asked if he shot anyone, Perez replied no and said he did not even aim at anyone. When asked what he would say if the detectives told him he had shot someone, Perez responded that it was either a lie or an accident. When the detective confirmed he had shot someone in the head, Perez said he "just wanted to get out of there, dude," and he repeatedly swore he did not mean to shoot anyone.

A detective explained that the men who were involved were saying they did not know who Perez was, and that the man who approached his vehicle really thought Perez was a friend of his but got scared when Perez showed him the gun. When the detective asked if Perez was sure these guys were the ones who blocked him in the previous day,

14

he said he did not know and they were all Caucasian and it was dark outside. Perez again swore he did not "mean it."

*Other Evidence*

Relevant to the three charges of criminal discharge of a firearm, the State presented evidence of bullet strikes at several other occupied and unoccupied residences in the area. Because Perez makes no argument regarding this evidence or his convictions on appeal, we find no need to further discuss that evidence.

The jury found Perez guilty of attempted murder in the second degree, aggravated battery, two counts of criminal discharge of a firearm, aggravated assault, and criminal possession of a weapon by a convicted felon. The jury found Perez not guilty of one charge of criminal discharge of a firearm.

*Sentencing*

Although sentencing was scheduled for December 5, 2019, it was delayed due to multiple motions and the pandemic. On December 15, 2021, the court sentenced Perez to a total of 338 months in prison with 36 months of postrelease supervision. Perez timely appealed.

ANALYSIS

I. *Did the district court err in refusing to give a self-defense instruction for charges other than aggravated assault?*

Perez first argues that a self-defense instruction on all charges involving the use of force was legally and factually appropriate and was relevant to his theory of defense. The

State responds that the instruction was not appropriate on any charge but aggravated assault, and even if the instruction was appropriate, its exclusion was harmless.

This court reviews claims of instructional error in three steps. First, the appellate court considers jurisdiction and whether the issue is preserved. It next analyzes whether the instruction was legally and factually appropriate. Finally, the appellate court reviews any error identified for harmlessness. The standard applied in the final step varies depending upon the context and whether the claim was properly preserved. *State v. Martinez*, 317 Kan. 151, 162, 527 P.3d 531 (2023).

*Additional Facts*

At the jury instruction conference, Perez objected to limiting the self-defense instruction only to the charge of aggravated assault of Pinaire. He argued that the State incorrectly asserted the instruction is applicable only where the defendant possesses the specific intent to kill and that he must expressly state that intent to kill. Rather, Perez argued there was sufficient evidence for a trier of fact to believe that he subjectively thought use of deadly force was necessary to defend his life, and that because this theory of defense was supported by the evidence, the requested self-defense instruction was necessary beyond aggravated assault. By failing to provide the instruction, Perez argued the court was preventing him from presenting his theory of the case.

The court found Perez was using nondeadly force because he was intending to shoot away from the men and insisted he was not trying to shoot anyone, and thus the subjective intent to justify a self-defense instruction was not present. Because he shot Young on accident, and a defendant cannot unintentionally act in self-defense, the trial court denied the self-defense instruction.

16

*Step One: Preservation*

Perez requested a use of force self-defense instruction on all charges, and the trial court denied this request. In doing so, Perez properly preserved this issue for appeal. See K.S.A. 22-3414(3). The State makes no argument that this issue was unpreserved.

*Step Two: Legal and Factual Appropriateness*

Next, this court has unlimited review of the record to determine whether the provided instruction was legally and factually appropriate. *State v. Holley*, 313 Kan. 249, 254, 485 P.3d 614 (2021). An instruction on self-defense is generally legally appropriate if the defendant was not already committing a forcible felony when they committed the separate act of violence. *State v. Barlett*, 308 Kan. 78, 84, 418 P.3d 1253 (2018); K.S.A. 21-5226(a). Neither party argues Perez was engaged in a forcible felony or that the instruction was not legally appropriate, so we presume the instruction would have been legally appropriate. See also K.S.A. 21-5111(n) (defining "forcible felony").

The parties focus on whether the self-defense instruction was factually appropriate. In determining whether an instruction was factually appropriate, courts must determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction. *Holley*, 313 Kan. at 255. Regarding self-defense, Kansas law provides:

> "(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force.
> "(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes that such use of deadly

17

force is necessary to prevent imminent death or great bodily harm to such person or a third person." K.S.A. 21-5222(a), (b).

Further, the Legislature has defined "use of force" and "use of deadly force" as they relate to self-defense:

"(1) 'Use of force' means any or all of the following directed at or upon another person or thing: (A) Words or actions that reasonably convey the threat of force, including threats to cause death or great bodily harm to a person; (B) the presentation or display of the means of force; or (C) the application of physical force, including by a weapon or through the actions of another.

"(2) 'Use of deadly force' means the application of any physical force described in paragraph (1) which is likely to cause death or great bodily harm to a person. Any threat to cause death or great bodily harm, including, but not limited to, by the display or production of a weapon, shall not constitute use of deadly force, so long as the actor's purpose is limited to creating an apprehension that the actor will, if necessary, use deadly force in defense of such actor or another or to affect a lawful arrest." K.S.A. 21-5221(a)(1), (2).

The self-defense statute establishes a two-part test to determine whether a use of deadly force self-defense instruction is applicable. The first part is subjective and "requires a showing that the defendant sincerely and honestly believed the use of deadly force in defense of self was necessary." *State v. Salary*, 301 Kan. 586, 593-94, 343 P.3d 1165 (2015). The second part of the test is objective and "requires a showing that a reasonable person in the defendant's circumstances would have perceived the use of deadly force in defense of self was necessary." 301 Kan. at 594.

*Subjective Belief*

The trial court adopted the State's argument that Perez did not have the subjective belief that use of deadly force was necessary because he stated he did not intend to shoot

18

anyone. The court relied on *State v. Jones*, No. 113,044, 2016 WL 852865 (Kan. App. 2016) (unpublished opinion), which was put forth by the State. In *Jones*, the defendant and two friends drove to a residence where the victim and his friends were hanging out. Outside of the house, one of the defendant's friends challenged one of the victim's friends to a fight. The defendant testified that he was focused on the confrontation between the two men, even when he heard someone say to shoot the defendant if he was "Scarface." 2016 WL 852865, at *2. Ultimately, the defendant shot the man who was fighting his friend and was charged with attempted first-degree murder and aggravated battery.

The defendant in *Jones* requested a self-defense instruction, arguing it was appropriate because there was evidence that the victim and another man had their hands in their pants as if they might be holding guns, he heard someone tell the victim to shoot the defendant if he was "Scarface," and there was evidence the victim had attempted to obtain a gun earlier that day. 2016 WL 852865, at *5. The trial court denied his request for a self-defense instruction, finding the defendant was the initial aggressor and the men were engaged in mutual combat.

The appellate panel agreed with these findings and also noted that the self-defense instruction was inappropriate because the evidence did not support the defendant's subjective and objective belief that self-defense was necessary. 2016 WL 852865, at *6. That panel noted the undisputed evidence that the opposing group was unarmed and never displayed any weapons, that the defendant continued to watch the fight rather than respond to the threat to shoot him if he was "Scarface," and that after the fight the defendant retreated to the car and did not shoot the victim until he thought he saw his friend get hit in the face. 2016 WL 852865, at *6. The court stated:

> "But the main reason a defense of person instruction would have been factually inappropriate in this case is because Jones unequivocally testified that he never intended to shoot anyone. Our Supreme Court has held that a defendant cannot unintentionally act

19

in self-defense. *State v. Collins*, 257 Kan. 408, 419, 893 P.2d 217 (1995). Self-defense is the intentional use of reasonable force to fend off an attacker. *State v. Bradford*, 27 Kan. App. 2d 597, Syl. ¶ 4, 3 P.3d 104 (2000). As this court has previously stated, 'a victim acting in self-defense intends to inflict injury on the attacker.' *Manning v. State*, No. 105,699, 2012 WL 3289951, at *3 (Kan. App. 2012) (unpublished opinion) (citing *Bradford*, 27 Kan. App. 2d at 602)." *Jones*, 2016 WL 852865, at *6.

Thus, Jones' testimony that he did not intend to shoot anyone, that he did not fire directly at the victim, and that he only wanted the people to go away was logically inconsistent with the claim that he subjectively believed deadly force was necessary. 2016 WL 852865, at *6. As Perez notes, an unpublished opinion is not binding precedent on another panel. *Graham v. Herring*, 297 Kan. 847, 861, 305 P.3d 585 (2013).

Rather than rely on *Jones*, Perez asserts that *State v. Heiskell*, 8 Kan. App. 2d 667, 666 P.2d 207 (1983), is a more appropriate guide in this case. The court in *Heiskell* found that a defendant is entitled to an instruction on their theory of the case even when the evidence is slight and supported only by the defendant's own testimony. 8 Kan. App. 2d at 673. Further, the *Heiskell* court reviewed Kansas Supreme Court precedent and found that a defendant may be entitled to a self-defense instruction even where they deny having committed the act underlying the criminal charge. Thus, a trial court errs when it accepts the defendant's denials as representing the entirety of their theory of the case when the jury may believe other evidence which also supports a self-defense theory. 8 Kan. App. 2d at 674-75.

Fundamentally, the trial court was required to review all the evidence in the light most favorable to Perez to determine if a self-defense instruction was warranted. See *State v. Friday*, 297 Kan. 1023, 1036-37, 306 P.3d 265 (2013) (if a defendant requests an instruction at trial, the court must view the evidence in the light most favorable to the defendant); see also *State v. Burgess*, 245 Kan. 481, 488, 781 P.2d 694 (1989) (noting while general rule is defendant is entitled to instruction on self-defense in homicide case,

20

the facts and evidence reveal no error in refusal to give self-defense instruction). The *Jones* panel's analysis appears to focus solely on the defendant's testimony, essentially assuming the jury would believe his statements and consider nothing else. While it was required to view the evidence in the light most favorable to the defendant, such an interpretation does not necessarily mean the court must believe the defendant's statements above all contrary evidence. Rather, the court must review and then interpret all the evidence to the defendant's benefit—even if that means disbelieving the defendant's own statements.

"In determining whether there is evidence that the defendant believed that force was necessary to defend himself, "'it is well to remember the test is not how much but is there any."'" *State v. Hill*, 242 Kan. 68, 78, 744 P.2d 1228 (1987). Further, a defendant's own assertions may be sufficient to establish his subjective belief. *State v. Walters*, 284 Kan. 1, 9, 159 P.3d 174 (2007). Because the court was required to review all of the evidence to determine if there was *any* evidence to support Perez' theory of self-defense, the trial court should not have followed *Jones* in reviewing solely Perez' testimony.

At trial, the State played the detectives' interview with Perez where Perez stated that he believed there were "like eight or nine" men coming at and grouping around him and that he felt like his life was in danger when he started to shoot the gun. Further, Perez told the detectives that the day before the shooting, several of Maria's neighbors not only blocked him in at the parking lot but followed him home and sat in front of his house. Perez alleged the men sitting outside of his home were calling him names and saying they would "get [his] ass."

Then, at Maria's apartment the day of the shooting, Perez said the group of men were yelling "fuck you" and saying "VLBs bitch." However, Perez said that when he was in his truck and getting the firearm, the men were 15 feet from the vehicle and coming closer, but they were still behind the fence surrounding the residences. Perez also said he

21

thought he saw "somebody had something or something" and that they were going to start shooting at him, though he did not clarify why he thought this. Perez then described pulling out the firearm and started shooting, and the men took off back toward the residence.

Maria also confirmed that one of the men was approaching Perez' vehicle, cussing him out, and telling him to get out of the car. Walker testified that he went outside and started yelling at Perez, asking "what the fuck are you doing?" and telling Perez to "[g]et out of here." Walker also said that when Young came outside, he thought Perez "didn't know if he was going to be outnumbered or what was going to happen." Young testified that Walker was drunk and on pills and yelling at the top of his lungs at Perez. Lastly, Investigator Holley testified she found a pellet gun on the couch in Nicholson and Young's living room, which she denied had an orange tip. Without the orange tip, the pellet gun is black and resembles a firearm.

The Kansas Supreme Court has found evidence supporting a defendant's subjective belief that deadly force was necessary where there was some evidence of physical aggression on the part of the victim and some evidence of a fear of assault on the part of the defendant. *Hill*, 242 Kan. at 79. It has also found a lack of evidence supporting a defendant's subjective belief that deadly force was necessary where there was no evidence the victim threatened the defendant with serious bodily harm, the victim did not display or reference a weapon, the victim merely attempted to or did punch the defendant, and the victim had previously threatened to kill the defendant and was known to carry a firearm. *State v. Gayden*, 259 Kan. 69, 84, 910 P.2d 826 (1996); see also *State v. Macomber*, 309 Kan. 907, 918, 441 P.3d 479 (2019) (defendant's use of deadly force was not statutorily justified where the victim did not threaten him and was unarmed, defendant was pretty sure victim did not have a gun, and the victim was not reaching for defendant's gun).

22

The issue here is not whether Perez was acting in self-defense but whether any evidence supports his subjective belief that it was necessary to use deadly force to defend himself. See *Hill*, 242 Kan. at 79. When viewing the evidence in the light most favorable to Perez, there is insufficient evidence for a rational fact-finder to find he subjectively believed the use of deadly force was necessary to prevent imminent death or great bodily harm. Perez said he thought the men might shoot him, but he did not say he saw any weapons or that they mentioned any weapons. Rather, the evidence shows the men were, at most, using threats or threats of ordinary force, challenging him to fight and referencing a street gang while they cussed at him and told him to leave. Even if Perez' statements that there were eight or nine men were to be believed, he also said the men never left the gated area surrounding the apartments while he was outside of that area. There was insufficient evidence that a juror could think Perez believed he needed to use deadly force to prevent imminent death or great bodily injury. K.S.A. 21-5222(b).

*Objectively Reasonable*

Even if Perez subjectively felt it necessary to use force in self-defense, we find Perez' belief was not objectively reasonable. There is no evidence the approaching men were armed, that Perez believed they were armed, or that anyone was close enough to hit or grab him. Instead, the men came outside; Perez may have gotten close to Nicholson at one point, but otherwise Perez was at least 15 feet away from the other men and they did not leave the gated area; the men said "fuck you," "get out," and "VLBs bitch"; they called Perez a pussy and bitch; and they told Perez to leave. The only instance of a threat of deadly violence came from Perez himself when, as Nicholson testified, Perez was walking back to his truck saying he was going to blow their heads off.

A criminal defendant is generally entitled to an instruction on the law applicable to every theory of defense that is supported by competent evidence. See K.S.A. 21-5108(c); *State v. Keyes*, 312 Kan. 103, 107-08, 472 P.3d 78 (2020). Competent evidence is defined

23

as evidence that "could allow a rational fact finder to reasonably conclude that the defense applies." K.S.A. 21-5108(c). Even viewing the evidence presented at trial in Perez' favor, there is no competent evidence to show a reasonable person in his position would have believed the use of a deadly weapon was necessary to protect Perez from imminent danger. See *Friday*, 297 Kan. at 1039 (finding a reasonable person would not believe use of deadly force was necessary where the victim was only "talking shit" and was not fighting back); *Gayden*, 259 Kan. at 84 (defendant's belief that use of force was necessary was not objectively reasonable where the victim was unarmed and did not display a weapon, did not verbally threaten to harm the defendant or appear to have the ability to make good on any such threat, and the victim did nothing more than strike once at the defendant). Had Perez stated that one of the approaching men had a gun or brandished a weapon of some sort, the analysis would likely come out differently due to the competing narratives. But that is not the case here. See *Keyes*, 312 Kan. at 110 (noting that the parties presented competing narratives, highlighting the importance of submitting the self-defense instruction to the jury for consideration).

Even if we found evidence supporting Perez' subjective belief that the use of deadly force was necessary, which we do not, his belief was not objectively reasonable and was thus not factually appropriate. See *Holley*, 313 Kan. at 255.

*Step Three: Harmlessness Inquiry*

Having found the self-defense instruction was not factually appropriate, we next assess exclusion of the self-defense instruction for harmlessness. Because Perez preserved his challenge for appeal by requesting the instruction, this court applies one of two harmless error tests. If the instructional error impacted Perez' constitutional rights, we assess whether the error was harmless under the federal constitutional harmless error standard, i.e., whether there was no reasonable possibility that the error contributed to the verdict. If no constitutional right was impacted, we assess whether there is no reasonable

24

probability the error affected the trial's outcome in light of the entire record. 313 Kan. at 256-57. The parties disagree on which standard applies to the denial of a request for a self-defense instruction, and the Kansas Supreme Court has not yet clarified this issue. See 313 Kan. at 256-57.

Even assuming the higher constitutional standard applies, it cannot be met. See 313 Kan. at 257 (without deciding which standard applies, finding that the constitutional standard for harmlessness was met by the trial court's failure to provide a self-defense instruction). There is no evidence whatsoever from which a jury could have found that Perez' actions were objectively necessary to prevent the imminent threat of unlawful use of force, death, or great bodily harm against him. See K.S.A. 21-5222; PIK Crim. 4th 52.200 (2021 Supp.). As a result, there is no reasonable possibility that the error contributed to the verdict. 313 Kan. at 256-57.

## II. *Did the district court err in refusing to give a jury instruction for attempted voluntary manslaughter?*

Perez next argues that the district court erred by denying his request for a jury instruction on the lesser included offense of attempted voluntary manslaughter. He argues there was sufficient competent evidence that he subjectively believed the use of deadly force was necessary in his self-defense, and so an instruction on attempted voluntary manslaughter was appropriate even if we find his belief was objectively unreasonable. The State responds that the evidence showed Perez did not subjectively believe the use of deadly force was necessary, and so an attempted voluntary manslaughter instruction was inappropriate.

As stated in Issue I, this court reviews claims of instructional error in three steps. First, the appellate court considers jurisdiction and whether the issue is preserved. It next analyzes whether the instruction was both legally and factually appropriate. Finally, the

25

appellate court reviews any error identified for harmlessness. The standard applied in the final step varies depending upon the context and whether the claim was properly preserved. *Martinez,* 317 Kan. at 162.

*Additional Facts*

At a conference during trial, Perez requested a jury instruction for voluntary manslaughter on an honest but possibly unreasonable belief that self-defense was necessary. Perez argued the instruction should be given because the evidence showed he subjectively believed use of deadly force was necessary and, even though the jury could believe the use of deadly force was objectively unreasonable, the instruction was warranted. Perez noted the State again argued he was not entitled to such an instruction unless he explicitly intended to kill someone, but Perez argued that was not the rule and failure to give the instruction prevented him from presenting his theory of defense. The State argued Perez did not possess the subjective belief that deadly force was necessary as demonstrated by his repeated comments that he did not intend to shoot anyone and, as a result, the self-defense instruction was not appropriate. The State pointed out Perez said shooting Young was an accident and argued under Kansas appellate caselaw, a person acting in self-defense intends to inflict injury on the attacker. The court denied the instruction.

*Step One: Preservation*

Perez requested an instruction on voluntary manslaughter, and the trial court impliedly denied that request in its analysis of the self-defense instruction. This issue is properly preserved for appeal. See K.S.A. 22-3414(3).

26

*Step Two: Legal and Factual Appropriateness*

Next, this court has unlimited review of the record to determine whether the requested instruction was legally and factually appropriate. *Holley*, 313 Kan. at 254. Attempted voluntary manslaughter is a lesser included offense of attempted second-degree murder. Because Perez was charged with attempted second-degree murder, an instruction for the lesser included crime of attempted voluntary manslaughter would have been legally appropriate. See *State v. Gallegos*, 286 Kan. 869, 874, 190 P.3d 226 (2008); see also K.S.A. 21-5109(b)(4).

"'District courts have a duty to issue instructions on any lesser included offense established by the evidence.'" *State v. Roeder*, 300 Kan. 901, 921, 336 P.3d 831 (2014) (quoting *State v. Nelson*, 291 Kan. 475, 480, 243 P.3d 343 [2010]). As relevant here, voluntary manslaughter is "knowingly killing a human being committed . . . upon an unreasonable but honest belief that circumstances existed that justified use of deadly force under K.S.A. 21-5222." K.S.A. 21-5404(a)(2). This is also referred to as "[i]mperfect self-defense voluntary manslaughter." *State v. Seba*, 305 Kan. 185, 208, 380 P.3d 209 (2016). Additionally, voluntary manslaughter references the self-defense statute, meaning the circumstances which the defendant honestly believed to exist must have been such as would have supported a claim of perfect self-defense. *Roeder*, 300 Kan. at 923.

In assessing appropriateness of a voluntary manslaughter instruction, there is no objective inquiry—only subjective. *State v. Qualls*, 297 Kan. 61, 70, 298 P.3d 311 (2013). Even so, the question is not purely what the defendant subjectively believed. Rather, the review looks at the underlying reason the defendant subjectively believed deadly force was necessary. For example, a defendant's "'unreasonable but honest belief' necessary to support the 'imperfect right to self-defense manslaughter' cannot be based upon a psychotic delusion." *State v. Ordway*, 261 Kan. 776, 790, 934 P.2d 94 (1997).

27

Thus, the question is whether there was evidence of Perez' subjective belief that unlawful force was imminent when that evidence is viewed in the light most favorable to him. *Qualls*, 297 Kan. at 70.

We find there was insufficient evidence that Perez subjectively believed use of deadly force was necessary to defend himself against imminent death or great bodily harm. Although Perez said he thought the men might shoot him, he did not see a weapon and did not say any of the men referenced a weapon. Rather, the evidence shows only that they challenged him to a fight, referenced a street gang, cussed at him, and told him to leave. Even if Perez believed there were eight or nine men, they did not leave the gated area to follow him, and he was in his truck with the door closed when he started shooting. *State v. Gonzalez*, 282 Kan. 73, 111, 145 P.3d 18 (2006) ("This voluntary manslaughter analysis is identical to the first, subjective prong required to justify a self-defense instruction.").

As for whether the self-defense instruction was factually appropriate, Perez unequivocally repeated that he never intended to shoot anyone. A defendant cannot unintentionally act in self-defense. *State v. Collins*, 257 Kan. 408, 419, 893 P.2d 217 (1995). "Self-defense is the intentional use of reasonable force to fend off an attacker. The concept of recklessness does not fit within the definition of self-defense." *State v. Bradford*, 27 Kan. App. 2d 597, 601, 3 P.3d 104 (2000), *superseded by statute on other grounds as stated in State v. Cordray*, 277 Kan. 43, 82 P.3d 503 (2004). Perez' testimony that he was not trying to hit anyone while firing his gun is logically inconsistent with a claim that he subjectively believed deadly force was necessary. Therefore, we find that the voluntary manslaughter instruction requested by Perez was not factually appropriate.

28

*Step Three: Harmlessness Inquiry*

Even though we find the voluntary manslaughter instruction was not factually appropriate, we continue to the final harmlessness inquiry. When a district court fails to instruct on a lesser included offense, this court reviews that failure under the nonconstitutional harmlessness standard. *Salary*, 301 Kan. at 599 (applying nonconstitutional harmlessness test to failure to give a voluntary manslaughter instruction). Accordingly, we assess whether there is no reasonable probability the error affected the trial's outcome in light of the entire record. *Holley*, 313 Kan. at 256-57; *Salary*, 301 Kan. at 599.

All the State's witnesses testified that only three men were outside with Perez on the day of the shooting, they remained inside the fenced-in area surrounding the apartments, they at most were goading Perez to fight, and none of them were armed or referenced any weapons.

After a careful review of the entire record, we conclude there was no reasonable probability that declining to provide a voluntary manslaughter instruction affected the trial's outcome.

III. *Did the district court err in failing to advise Perez of his right to a jury trial when it accepted his elemental stipulation as to the charge of criminal possession of a firearm by a convicted felon?*

Perez argues that the trial court erred by accepting his stipulation to several elements of the criminal possession of a firearm charge without first obtaining a knowing and voluntary waiver of his right to a jury trial on those issues. He argues this error impeded his right to due process and to a fair and impartial trial, which requires reversal of that charge. Although Perez raises this argument for the first time on appeal, he asserts that its review is necessary to serve the ends of justice or prevent a denial of fundamental

rights. The State does not respond to Perez' failure to raise this issue previously, and instead asserts that Kansas Supreme Court precedent underlying this issue was incorrectly decided and alternatively that the error was harmless. Kansas appellate courts have addressed the same issue for the first time on appeal, and we also find it appropriate to review it for the first time on appeal. See *State v. Shopteese*, 283 Kan. 331, 339, 153 P.3d 1208 (2007) (citing exceptions to general rule that issues not raised before district court cannot be raised on appeal); *State v. Johnson*, 46 Kan. App. 2d 387, 397, 264 P.3d 1018 (2011) (addressing for first time on appeal issue of whether district court advised defendant of right to jury trial).

At trial, before resting, the State submitted a stipulation of facts as to the charge of criminal possession of a firearm. The stipulation provided:

> "The parties stipulate that the Defendant, Rafael Perez, was convicted of a felony within the preceding 10 years and was not found to be in possession of a firearm at the time of that crime. No further evidence is needed to prove Elements #2 and #3 of the Criminal Possession of a Weapon by a Convicted Felon Instruction."

The State noted that the stipulation was signed by Perez, his defense attorney, and the prosecutor.

When a defendant stipulates to an element of a charged crime, they have "effectively given up his or her right to a jury trial on that element." *State v. Johnson*, 310 Kan. 909, 918-19, 453 P.3d 281 (2019). Further, because defendants have "the fundamental right to a jury trial, courts cannot accept a jury trial waiver '"unless the defendant, after being advised by the court of his right to trial by jury, personally waives his right to trial by jury, either in writing or in open court for the record."'" 310 Kan. at 919.

Although failure to obtain a jury trial waiver is usually a structural error requiring reversal, failure to obtain a waiver before stipulating to less than all elements of a charged crime is not structural error because it "does not constitute 'a defect affecting the framework within which the trial proceeds.'" *State v. Bentley*, 317 Kan. 222, 233, 526 P.3d 1060 (2023). Rather, failing to obtain a jury trial waiver when a defendant stipulates to less than all the elements of a crime is similar to the trial court's failure to submit an element to the jury. 317 Kan. at 233.

Accordingly, when a trial court fails to obtain a constitutionally sufficient waiver of a defendant's right to a jury trial before accepting a stipulation as to some of the elements of a charged crime, this court reviews such a deficiency under the constitutional harmless error standard. 317 Kan. at 233-34. "A constitutional error is harmless only if the party benefitting from the error demonstrates 'beyond a reasonable doubt the error will not or did not affect the trial's outcome in light of the entire record, i.e., when there is no reasonable possibility the error contributed to the verdict.'" 317 Kan. at 234. But the court in *Bentley* further narrowed the review, finding "that courts should conduct that harmless-error analysis 'through a more focused lens' and decide whether there is a 'reasonable possibility' that the failure to inform the defendant 'of his right to jury trial led to his decision to enter the stipulation.'" *State v. Guebara*, 318 Kan. 458, 470, 544 P.3d 794 (2024) (discussing holding in *Bentley*).

Although the State argues that, as in *Bentley*, Perez' criminal convictions would have been easy to prove had he not entered the stipulation, that is not what *Bentley* requires to find harmlessness. *Bentley* instead noted that there was no evidence presented at trial other than the stipulation from which the jury could conclude the defendant had previously been convicted of a felony. "Thus, if the failure to secure a constitutionally sufficient jury trial waiver led to the stipulation, then it clearly affected the verdict, because the jury had to rely on that stipulation to find that the State proved that element of the crime." 317 Kan. at 234. But, the trial court's failure to advise the defendant in

31

*Bentley* of his right to a jury trial on the stipulated facts was harmless because there was evidence his trial counsel discussed the stipulation with him and that he agreed to the stipulation in order to keep his criminal history from the jury. There was evidence the defendant would have stipulated to the elements even if the trial court had advised him of his right to a jury trial. 317 Kan. at 234-36.

In this case, there was nothing presented at trial regarding Perez' criminal history except for the stipulation. Significantly, there is nothing in the record regarding Perez' discussions with trial counsel about the stipulation or anything to suggest that Perez would have stipulated regardless of a proper advisement of his right to a jury trial. In addition, there is nothing in the record to indicate that the State was prepared to present evidence of Perez' prior convictions had he not stipulated; namely, the State did not introduce the journal entry of Perez' prior conviction into the record but outside the jury's view. See *Guebara*, 318 Kan. at 472-73.

Under the more focused lens of *Guebara*, and after careful review of the record, we conclude the trial court's error in failing to obtain a waiver of Perez' right to a jury trial on the stipulated facts cannot be held harmless. There is nothing to support a finding that a reasonable possibility existed the trial court's failure to inform Perez of his right to a jury trial on the stipulated elements did not impact his decision to enter the stipulation. See 318 Kan. at 470. Reversal is required solely on this issue; thus, Perez' conviction of criminal possession of a weapon by a convicted felon is remanded for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded with directions.